Ms. Slagle and Mr. Dreyer. Good morning. My name is Beth Slagle and I represent Robert Hoivs, the appellant in this matter, and I would like to reserve three minutes of rebuttal time. What I would really like to focus on today is not the issues or facts as briefed in our brief, but I would like to focus on the arguments raised in Appallia's brief. The primary issue here is, in terms of an interpleader, an interpleader must be filed in good faith to be immune from, for the interpleader to be.  They acted in six months. It took them six months to file an interpleader. But they, Michelle died what, in February? Is that right? She died at the end of February. She did the change in beneficiary form in... January 6th. January 6th. She changed the beneficiary in January 6th and then they investigated it because it does seem reasonable for them to be concerned where the agent becomes the beneficiary and the owner of the policy. Especially when they have a policy against that. Okay, but that's an internal policy. An internal policy shouldn't impact the insurance rights under its contract. Now, if you look at the insurance contract, it gives the insured a unilateral right to change the owner and to change the beneficiary. Wouldn't they, though, have an obligation to make sure that there wasn't an overreaching, which could happen. You know, it does happen. I think, I think it's an excellent policy to have. However, what Prudential could have done and should have done so that the insured was aware that its right to unilaterally change the beneficiary or owner under a policy is to identify that in the policy. Now, there are other places in the policy which say, hey, if you want to change something, insured, we have to consent to it. Okay, in this, it's the portions related to beneficiary change and ownership change are on 432 and 433 in the appendix. And what it states is, you insured may designate or change a beneficiary by sending us a request in a form that meets our needs. If we receive your request, we will file and record the change, and it will take effect. But they have something in the form. She dies at the end of February. How soon thereafter did he present his claim? It was within, it was on March 7th, so it was within 10 days. Okay, and then they immediately note, okay, we got an issue here. You were, you worked for us, and ultimately they did allow the change of beneficiary, is that correct, but not the change of ownership? That's correct. And how soon thereafter did they begin to tell him that there was, look, we got an issue here? That would have been, well, they had been investigating this, the issue, from day one, okay? They knew from day one that he was. From January 6th, they had been investigating. Exactly, exactly. And so when did they say, okay, but now after our initial investigation, we have a problem, and we need to buck this up further because we've got a policy against our agents owning or being beneficiaries on policies that they write. Well, it was even at the end of March. There was communications with Mr. Hovis that said, internally, we've approved your beneficiary change. You'll be getting paid soon, okay? And then it went into corporate investigative division. Once it was paid, don't you think they would have been sued almost immediately by Potter and Gursky? I mean, like yesterday? Not necessarily. I mean, apparently, I mean, it's our contention that they didn't even know about the policy. If they found out about it, they would not have been real happy. Well, Prudential also in its policy indicates that once it pays the proceeds to someone, then it has no liability to anybody else. I mean, they would have to fight it out between Hovis and Potter and Gursky. Well, there was a settlement here between the prior beneficiary and your client, right? Now, what damages do you think Prudential owes your client? Well, at a minimum, at a minimum, it would be the amount that they didn't get, that he didn't get in the settlement plus attorney's fees. So Prudential, in your view, though, would be entitled to an offset. I don't know. I never know. Offset or set off for the amount you did get in the settlement. Yes. So that would have to be subtracted. The question here is this. The question involved here is called the independent liability rule. And the question, then, is this. The independent liability rule, at least in the old equity practice, would bar interpleader for that regard for the rights of the claimants among themselves. The stakeholder is separately liable to one or more of them. Are you saying that the stakeholder – in other words, you can have this situation. And it was good for a good laugh with my brother and I, because we have the same – our wives have the same first name. We laughed one day about my mother dying and said nothing laughing about that, but her will saying, to my beloved daughter-in-law, Barbara, I leave this and that and that. Well, my brother said to me, he's a retired Superior Court judge in New Jersey, that's what lawsuits are made out of. So suppose, though, the executor said to one of them, oh, yeah, you're going to get that money. I know there's another daughter-in-law named Barbara. You're going to get that money so you can go do all these things you want to do. And then the executor doesn't give her the money. So that could be an independent liability. That's the independent liability rule. But what's the independent liability here? I went over the counterclaim, and I'm not sure I quite understand it. The independent liability of credential. Yes, that's it. That's the stakeholder here. Right, right. I mean, it's based upon their lack of diligence in terms of processing the ownership change and the beneficiary change. They didn't once pick up – I mean, they knew that there was an issue. They knew that this woman was going to die. They didn't pick up the phone and say, is this what you wanted in your change? We recognize in the policy that you absolutely have the right to change the beneficiary or ownership. It was their own internal policies that they were hiding behind and shielding themselves from in this lawsuit. Well, I'm sorry. What she wanted to do, she'd already demonstrated what she wanted to do. I agree with that. They shouldn't have had to, but that's what their internal policies. I mean, the contract is specific. The owner of the policy, the insurer, gets to unilaterally change how she wants to change the policy. Okay? But right now, credential is hiding behind their internal policies and saying, well, we had to delay. We had to do this investigation. Okay? But if they had to do that investigation, wouldn't it have been the smartest thing, especially when they knew she was going to die, to pick up the phone? You're saying the credential would not be in the position. For example, suppose somebody had an insurance policy, and it was just written in ordinary course, and the insurance company knew nothing about this, or there was a bank deposit, and the man said in his insurance policy, to my wife, I leave my, he directs that his policy be paid to his wife at the time of his death, whoever that might be, and the company will allow that. And then it turns out that there's a dispute between two women as to who his wife was, because the second one says, you know, the first one says, no, the divorce was invalid. Now, the company is completely innocent there. But you're saying credential was not innocent. Correct. Correct. There wouldn't have been an issue had they picked up the phone and talked with her. They would have found out that there was another witness present when she signed those forms. They would have also found out that at the same time that she was changing this policy, ownership and beneficiary form, she was changing another policy, which credential did pay out on. Okay? They never challenged that signature. But put yourself in credential's shoes. There is a legitimate dispute, is there not, as to who gets those proceeds? There were competing claims that were filed. Okay? It sounds like a legitimate dispute if you're in Prue's shoes. It sounds like a yes answer to me. But there were definitely competing claims. But what the lower court did is say, hey, there's competing claims. Yes, there were competing claims. So isn't that why Rule 22 was. . . leading up to that interpleader claim? And that's what the issue is here. The court said, yeah, there was competing claims. And we agree. There was competing claims filed. But that doesn't permit the court to overlook what happened prior to this. Let me give. . . Your client didn't have to settle with the competing claimant. Your client could have said, well, she did indicate she wanted me to get this money. And I'm going to litigate this and claim this. And then I'll have a contest with the son over who gets this money. And then the court would have determined it. And then that would have been the end of the issue. Then if the court determined, no, that was an invalid assignment and change, then your client wouldn't have gotten any money and wouldn't have been entitled to any money. One of the obvious reasons why they had to settle was they were wasting all their money,  The point is that if you're in prudential shoes and you have competing claims, as you say, therefore a legitimate reason or dispute, all Prue is saying is, look, we're going to hand it over to the court. Court, you decide. And that's what interpleader is all about. Right. But let's use an example, okay? Interpleader was one way to handle the claim. And how this otherwise could have been. . . If you had done anything other than interpleaders, you would have been questioning why Prue did it. No, not necessarily. For example, okay, interpleader was one manner in which this case could have been handled. However, the hovis or prudential could have filed a declaratory judgment action, okay? Either of them could have filed a declaratory judgment action. But the first thing that pops into your mind in law school is interpleader. Well, I agree with that. However, there's not that much of a difference between a declaratory judgment action and an interpleader in terms of determining the rights of individuals to access policies, okay? And under a declaratory judgment action, clearly if hovis had filed a bad faith claim, those claims would have been heard, not summarily dismissed. Do you agree with the district court's statement that all of your counterclaims, they relate to prudential's failure to pay hovis? No, no. It was conduct, unreasonable conduct in the investigation in which they had absolutely. . . They didn't even. . . Under the policy, they had no right to conduct an investigation. But the cases you rely on have delays of much, much longer than what happened here. Well, let me ask you. . . Isn't that a jury issue, though? How long a delay should take? Should it take six months? Should it take a year? Should it take two years, okay? How long is it? I mean, isn't that an issue for the jury to determine what is a reasonable amount of time. . . It would be hard to prevail on a claim that took just, or an interpleader that just took a few months after investigation. She dies at the end of February, and they brought the interpleader action when, in July? In July. Not very long. But what about not picking up the phone and talking with her? Well, that's between January 6th and Michelle's death at the end of February. Correct. That's a possible negligence claim, but it still relates to the failure to pay Hovis the insurance proceeds. What about not speaking with Hovis? I mean, there was just no communication. It was this whole investigation, and when you're talking about a bad faith claim, there are. . . But they did speak with Hovis, by the way. Not post. They sent him letters saying, we can't decide. Sounds pretty reasonable. Why don't we hear from your opposing counsel, and then get you back on the button. Okay. Thank you. Mr. Dreyer. Good morning, Your Honors. Jonathan Dreyer for the Prudential Insurance Company of America. Mr. Dreyer, counsel raised a very interesting point here, which I had to focus. She points out that Prudential, in its policy as it's written, didn't reserve the right to investigate, and that even though that's a good idea, and I can understand why it's a good idea, that if Prudential wanted to reserve that right. . . Because, look, let's face it. When people are changing insurance policy beneficiaries, they're changing it because they expect to die at some point, and that could be very soon. And so by delaying a change as directed by the insured, there's always a chance that the insured might die, you know, while the whole thing is pending. That's what happened here, obviously. So why didn't Prudential then say, you can change your beneficiary, but provided, however, that we reserve the right before we accept the change to investigate to make sure, if it's one of our agents, that this is a legitimate change in some language, which I know Prudential would know how to write. But they didn't do that, did they? It doesn't specifically say that in the policy, Your Honor. It doesn't say it specifically. Does it say it at all? It points out that there are other provisions that they have to agree to. Your Honor, in this particular instance, you couldn't make a policy that was specific enough to cover every conceivable circumstance, including something like this. It's not so remote because Prudential actually had a policy on it. And it's not remote to think that an agent who was dealing with the insured might overreach. But that fact is not remote at all. In fact, Mr. Hovis concedes that that's a legitimate policy in his testimony. He concedes in his testimony that any number of old ladies have attempted to put him on as beneficiaries of his policy. This is a real problem. But to actually provide that specific circumstance as a basis for investigation in the policy itself would be far more specific than you could ever have. The company has an obligation to make sure that, in any situation, that the money is paid to the right person and that the money that is paid is entitled to go out. You want to know for sure that, in fact, the beneficiary, that the person's dead. They require a death certificate. All claims, the basic policy provides that it will investigate any type of claim before it is paid. For example, if someone dies, there's a suicide clause in some of the policies for a certain amount of time. They're going to go back and look at that. If there's a misrepresentation in the application for life insurance, they're going to go back and look at that. The policy doesn't say specifically we're going to go through all these particular instances, but it does say that the company will investigate any claim in any circumstance surrounding the claim. What the company is doing, though, is setting up a policy there that in the nature of things sets up the possibility of lawsuits because unless it completes its investigation very promptly, you know, when it gets to change. I'm not talking about the investigation after death, but when it gets to change before the death, then it's setting up a situation in which the beneficiary has tried to change, the owner, the insured has tried to change the beneficiary and didn't do it, and therefore the old beneficiary can make a claim and so can the new one. I mean, it's setting itself up for a lawsuit. But you're going to have that situation anyway. In this particular instance, there's been the suggestion that Prudential somehow did something to goad Mr. Potter into filing this claim. In fact, the testimony. No, I think what the claim was, look, she signed on January 6th a change of beneficiary and a change of ownership. So you had a month and a half before Michelle died. Why didn't somebody, if they were doing an investigation, pick up the phone or meet with her, in some way find out from her directly, is this what she really wanted to do? First of all, Your Honor, the January 6th date I believe is wrong. I believe it's January 23rd. January 6th is the date of the wedding of the marriage license. January 23rd is the date. So now you're within one month. Now, maybe it makes sense if you can get somebody out to actually physically meet with her, perhaps. But to actually call her up on the phone, the woman's terminally ill. How are you going to know what condition she's in by making a phone call? How are you even going to know who you're talking to? I guess you only know it by making the efforts, what she's saying. Well, if you accept that that's unreasonable, that the conduct here even so, how was he damaged? How was he damaged? He had his lawsuit. Nobody ever said we weren't going to pay him. Nobody ever said we weren't going to pay anybody. What we said is we're not going to pay both of you. Mr. Potter has testified that the only reason there were not competing claims against this policy from day one was because Hovis told him he was taking care of it. Hovis never told him about the change. But let's say he was damaged by, if you believe Ms. Slagle, that Mr. Hovis was damaged by virtue of not getting the entire proceeds when, in fact, that was the intent of Ms. Schell. Mr. Hovis could have litigated the validity of the change. And he chose to settle. He chose to settle. I mean, he had that option. Nothing that Prudential did or didn't do. And he may very well have gotten nothing. And if you look at, again, I'm not taking a position one way or the other. And obviously for Pru, you're not supposed to. I can't. I can't. The change, your argument is this. Look, the change was either legitimate, in which event he would have gotten the money if he had litigated it out with the other claimant, or it wasn't legitimate, in which event he wouldn't have gotten the money. That's right. So, therefore, you shouldn't be liable. You're not like in a, see, there's an estoppel situation. For example, if he had called the company and said, look, I know there's a problem here because I'm the beneficiary under her change, but you didn't effect, you didn't do it yet, and I want to buy a new house. And Prudential said, oh, don't worry. You go buy that house. Now Prudential is independently liable, maybe, regardless of whether because of their own conduct, and there's an estoppel against them. That's not this case. It's not this case, Your Honor. And conceptually, I understand what you're saying, but it is not this case. But more importantly, the thing is. But you can put yourself where you're independently liable. There's no question. Theoretically, yes. But here, no. And the thing that no one seems to be focusing on here is everyone's saying Prudential was bad. Prudential should have investigated. They should have done quicker. They should have done whatever. How is any of this, how does it benefit Prudential to have two claimants instead of one? You know, the whole concept of a bad faith of a negligence is that Prudential's acting in its own self-interest in order to shaft Mr. Hovis. I agree with you. It would be hard to show bad faith. We agree. The argument that I hear is that Prudential was negligent by how it went about this claim while Michelle was still alive. Well, Your Honor, they looked for documentation. Mr. Hovis didn't help things because he submitted the claim through the wrong procedure to begin with, and it had to go back and waste some of the time. He should have had an exception. What procedure did he use? He submitted a paper to the wrong section of Prudential that should have had other documentation with it, and as a result, they had to go back to him and get additional documentation to show that the exception, that circumstances for an exception might apply. Again, if you're looking at a period from January 23rd to February 20th, you're looking at a period of one month, which is not a lot of time in insurance standards. And, again, if you go back to the point, how was he harmed? If, in fact, the change was valid, he could have still gotten his money. If it was not, he didn't deserve anything, and maybe he got $50,000 that he wasn't entitled to. But how did the fact that this change was not approved and the money handed to him on day one, how did that affect him other than the fact that he didn't have money he might not have been entitled to? Now, there was a suggestion that Prudential could have filed a declaratory judgment action instead of an interpleader. I'm not sure I get the difference as to how the ramifications would have been different from the standpoint of Mr. Hovis. I don't see a difference. This is what you normally think of in this situation. This is classic. I'm sorry, Your Honor? This is classic interpleader. I think the trial court said that. I don't think that's the right solution. Thank you, Your Honor. Thank you. Ms. Legle. How do you deal with Mr. Dreyer's statement or claim that your client really wasn't injured? He could have chosen to go and have a trial and did not do it. I mean, you're saying, okay, but it costs money, and he's thinking about the cost-benefit, but that was his choice. That doesn't preclude him from having. I mean, that's just talking about the compensatory damage portion of another claim. That doesn't impact his ability to get other damages vis-à-vis a negligence claim, bad faith claim, attorney's fees that it cost him. But other than in the 28 days from January 23rd to February 20, not picking up the phone and calling Michelle, and my guess is during that last week or two, one could not have spoken to her anyway. So let's say it was a two-to-three-week delay. I mean, is that really negligence? It's not just that portion. It is in terms of not hiding behind the shield of an internal policy, which impacted the insured's right to choose. You were in-house counsel for approved. I mean, would you have anything other than that internal policy? I would have that internal policy, but, one, I would put it in the policy specifically saying, hey, if you want to do an ownership or beneficiary change, we require consent. I mean, we get the right to approve that. Okay? And it doesn't have to be specific to a prudential, if there's a prudential agent involved. It can be a general consent. Does an insurance company have a duty to protect its beneficiaries, its insureds from overreaching by its agents? Doesn't it have a duty to make sure that that doesn't occur? That's true. It does have that duty. So you're just saying they took too long to do it in this case? They took a very long time. They failed to take — Well, the only critical time was the time between when they got the request to change the beneficiary and when she died. Because after that, the die was, if I can use the term, the die was cast at that point. So did they take too long before she died? Because they couldn't. I mean, there's the answer. There's the question. It's not just in terms of taking too long before she died. What they did was fail to comply with the insured's request. They failed to process the change request, even though the policy mandated they do that. And even in their 30B-6, deponent says they have the right to — the insured has the right to make any change that she wants at any time. Right? They required proof of an insurable interest. There's nothing in the policy that says — But that sounds like it's good practices. It's good, but that's not what the policy says. That's not what the insurance policy says, and that's what mandates. But it would not be an indicator of negligence. It would not seem to be. Anyway. I have no further questions. Okay. Thank you. Thank you very much. Thank you to both counsel for well-presented arguments. We'll take the matter under advisement.